UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DELTA AIR LINES, INC.,      )
                              )
       Plaintiff,       )
                              )   CASE NO.1:13-CV-03388-MHC
vs.                    )
                              )
JOHN WUNDER, et al.,     )
                              )
       Defendants.     )

**RESPONSE TO THE LEMLEY DEFENDANTS'
STATEMENT OF UNDSIPUTED MATERIAL FACTS
AND STATEMENT OF ADDITIONAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Delta Air Lines, Inc. ("Delta") hereby responds to the Lemley Defendants' Statement of Material Facts Not In Dispute [DE 344-2] and provides its own Statement of Additional Facts, showing as follows:

**RESPONSE TO LEMLEY DEFENDANTS' STATEMENT OF FACTS**

1.    Plaintiff Delta Air Lines, Inc. ("Delta") is a Delaware Corporation with a principal place of business at 1030 Delta Boulevard, Atlanta, Georgia 30320.

RESPONSE:    Admitted.

2.    James Curtis Lemley is a resident of Woodbridge, Virginia. Dynamic Premium Incentives, LLC and KTP, LLC are Virginia corporations with a principle address of 14527 Jefferson Davis Highway, Suite 201, Woodbridge, Virginia 22191

1

(collectively these persons and entities are hereafter referred to as the "Lemley Defendants").

RESPONSE:        Admitted.

3.      In the time period relevant to this litigation, the Lemley Defendants were engaged in the business of (1) distributing premium travel certificates and (2) as a separate business, in selling travel club memberships. (Deposition of James Curtis Lemley 11:6-18, 33:15-25, March 9, 2015, excerpts attached as Exhibit A hereto). The Lemley Defendants were engaged in selling travel club memberships only from around March of 2013 to November of 2013. (Lemley Dep. 44:6-10).

RESPONSE:        Admitted.

4.      When distributing premium travel certificates, the Lemley Defendants would purchase travel certificates from a vacation fulfillment company and then distribute them to a separate middleman distributor that would then sell or give the certificate to end users at travel club or other presentations. (Lemley Dep. 94:14-21). These certificates were often used as incentives. (Lemley Dep. 13:9-16).

RESPONSE:        Denied.  The Lemley Defendants acted both as travel certificate middlemen ("Middlemen") and as Distributors of travel club memberships, and the Lemley Defendants acted as the Middlemen for their Distributor business.  The Middlemen provided airfare vouchers to the Lemley Distributors and also sold to

2

other distributors and marketers, including numerous pre-lawsuit and post-lawsuit sales to CRW. *(Exhibit A, Lemley Depo at 94:19-23; 106:5-109:10; 110:6-19).*

5.      It was only in this certificate distribution capacity that the Lemley Defendants were affiliated with the Grand Incentives Defendants in any way. (Lemley Dep. 70:19-22).

RESPONSE:      Denied.  The travel certificates ultimately provided by the Lemley Middlemen were purchased from a number of third-party travel certificate companies, including Defendant Grand Incentives, Executive Tour and Travel Services ("ETTSI"), and several others.  The Grand Incentives Defendants were supposed to provide travel fulfillment to certificate holders who obtained their certificates as a result of attending one or more presentations hosted by the Lemley Defendants as part of their travel club membership sales business. *(Lemley Depo. at 11:6-23; 60:19-61:8; 78:17-79:16; 81:15-82:10; 249:4-250:2; and 267:12-268:1).*

6.      The Lemley Defendants' relationship with the Grand Incentives Defendants was characterized by disagreements. (Deposition of Lawrence Biondi, 232:11-233:21, April 21, 2015, excerpts attached as Exhibit B hereto; Lemley Dep. 72:1- 7). Often times, the Grand Incentives Defendants and the Lemley Defendants were at odds over whether an individual should be allowed to travel. (Lemley Dep. 70:11-72:7). In these disagreements, the Lemley Defendants sought to honor their

agreements with every customer— and would urge the Grand Incentives Defendants to travel the Lemley Defendants' customers. (Lemley Dep. 83:10-84:1). When Grand Incentives would not relent, the Lemley Defendants would issue the certificate holder a refund. (Lemley Dep. 70:11-72:7).

RESPONSE:        Delta denies that this is a relevant or material fact in the at-issue motion.  Delta stats that, in his deposition, Jose Martinez specifically contradicted Defendant Lemley's version of events, but in any event, the facts alleged in this paragraph are not relevant or material to motion for summary judgment.

7.     The Lemley Defendants did not use any Delta trademarks when acting as distributors of premium travel certificates. (Pl.'s Resp. to Def.'s Interrog. No. 1, 13, attached in full as Exhibit H hereto).

RESPONSE:        Delta admits that the travel certificates distributed by the Lemley Defendants did not themselves use the Delta Marks.  However, Delta denies that this means the Lemley Defendants did not use the Delta Marks in their Middleman business.  To attract attendees to their travel club sales presentations, the Lemley Distributors used direct mail campaigns in which they impersonated Delta and other famous third-party airlines via postcards bearing counterfeit marks of the victimized airlines.  *(Lemley Depo at 92:20-24; 115:15-23; 135:23-140:1; 160:11-19; 205:22-25; 256:10-14)*.  Each postcard notified the recipient that he would receive two

4

complimentary airfares pursuant to a supposed sales promotion by the airline. *(Id. at 98:18-99:16).* The Lemley Distributors' Delta-related postcards (the "Delta Postcards") each bore the "DELTA" Mark and Delta's "WIDGET LOGO" on the front and back of the postcard. *(Exhibit C, Sample Lemley Postcards (authenticated in TRO Motion [DE 10] at Ex. D.1 and D.2 to Huhn Dec.)).*

8.    Thus, the Lemley Defendants did not use any Delta trademarks related to their dealings with Grand Incentives. (Lemley Dep. 70:19-22).

RESPONSE:    Denied.  See response to paragraph 6 above.

9.    The business of distributing travel club memberships was totally separate from the Lemley Defendants' travel certificate business. (Lemley Dep. 11:6-18, 33:15-25).

RESPONSE:    Denied.  See responses to paragraphs 5 through 7 above.

10.    To sell travel club memberships, the Lemley Defendants would travel to different locations and put on presentations to sell memberships on behalf of various travel clubs (Vacation Travel Club, for example). Here, the Lemley Defendants acted as the middleman. (Lemley Dep. 37:22-25). It is in this capacity that Delta's claims against the Lemley Defendants arise. (Pl.'s Resp. To Def.'s Interrog. No. 1, 13).

RESPONSE:    Delta admits that some of its claims against the Lemley Defendants arise in the context described above.  However, Delta denies that this is the only context in which its claims arise.  Specifically, Delta's claims also arise with respect to the Lemley Defendants' distribution and sale of travel certificates as set forth in the responses to paragraphs 5 through 7 above.

11.    Delta's claims arise from the fact that, in connection with their business of distributing travel club memberships, the Lemley Defendants engaged third party printers and mailers to send postcards on their behalf inviting consumers to a travel club presentation. (Pl.'s Resp. to Def.'s Interrog. No. 1, 13).

RESPONSE:    Delta admits that some of its claims against the Lemley Defendants arise in the context described above.  However, Delta denies that this is the only context in which its claims arise.  Specifically, Delta's claims also arise with respect to the Lemley Defendants' distribution and sale of travel certificates as set forth in the responses to paragraphs 5 through 7 above.

12.    These third party printer and mailers were a company called SB Global and a company called CRW Marketing, both of which are named as defendants in this litigation. (Lemley Dep. 96:10-15). SB Global was the Lemley Defendants' primary printer, however, as CRW Marketing was used only for a short period of time. (Lemley Dep. 96:10-15).

RESPONSE:        Admitted.

13.    In working with these printer-mailers, the Lemley Defendants did not design the postcards or request any specific design. (Lemley Dep. 101:19-102:11).  Instead, the Lemley Defendants simply informed the third party printer of the target demographic that the postcards should be sent to. (Lemley Dep. 101:19- 102:11).

RESPONSE :        Denied.  Despite numerous earlier denials, the Lemley Defendants later admitted that they generally had input regarding, knowledge of, and/or access to promotional postcards before they were mailed by the Lemley Distributors' marketers.  *(See Exhibit H, Pre-Mailing Knowledge/Input)*.

14.    The postcards would then be sent to qualifying individuals who would be invited to call a telephone number and asked to attend a travel club presentation put on by the Lemley Defendants. (Pl.'s Resp. to Def.'s Interrog. No. 1; Deposition of Thomas Huhn, 39:20-25, February 17, 2015, excerpts attached as Exhibit C hereto). During this initial telephone conversation, Delta's name was not mentioned. (Huhn Dep. 40:22-41:6).

RESPONSE:        Delta admits that its name was not mentioned during the initial telephone conversation with Mr. Huhn but denies that the evidence cited supports the remainder of the facts alleged.

15.    The postcards themselves contained a disclaimer on them, specifying that all trademarks on the cards were property of their owners, but the postcards also included two Delta trademarks: the DELTA mark and the WIDGET LOGO mark. (Lemley Dep. 159:12-15; Pl.'s Resp. to Def.'s Interrog. No. 23).

RESPONSE:       Delta admits that the postcards included the DELTA and WIDGET LOGO Marks.  Delta also admits that the postcards contain a small-print paragraph, but it denies that this language is or constitutes a disclaimer.  The "disclaimer" supposedly relied upon by Lemley does not even arguably contain effective language.  *(Exhibit C, Lemley Delta Postcards)*.  The <u>only</u> mark-related provision states, "All trademarks and service marks are the property of their respective owners."  *(Id.)*.  <u>This meaningless sentence literally says nothing more than "whoever owns the mark owns the mark."</u>  This language does not purport to disclaim Delta's involvement and provides no notice whatsoever that the advertised airfare promotion is not an authentic Delta airfare promotion.

16.    The DELTA and WIDGET LOGO marks are registered only in connection with air transportation services. (See true and correct copies of trademark registrations attached as Exhibit D hereto.)

RESPONSE:       Admitted.

17.    While the Lemley Defendants were aware generally that Delta trademarks were being used on the postcards containing the disclaimer, the Lemley Defendants did not know that the disclaimer did not allow the use of the marks. (Lemley Dep. 133:15-21, 137:10-17).

RESPONSE:        Delta admits the Lemley Defendants were aware that the Delta Marks were being used on the postcards.  Delta denies that the postcards contained a valid disclaimer.   Delta denies that there is any factual basis for the Lemley Defendants' self-serving assertion that they "did not know that the disclaimer did not allow the use of the marks."   There is no evidence in the record that the Lemley Defendants were advised by counsel that the so-called "disclaimer" was effective or that it allowed them to use the Delta Marks in the manner in which they did.  There is no evidence in the record of any fact that justifies the Lemley Defendants' asserted "belief."   In other words, while Delta admits that the Lemley Defendants may have held this purely subjective belief, Delta denies there is any evidence in the record that such a belief was in any way objectively reasonable or justified.

18.    Ultimately, when individuals would come to the presentations, the Lemley Defendants would sell travel club memberships. At these presentations the Delta name was never used, and no Delta trademarks were used. (Ex. 4 to Huhn Dep.; Huhn Dep. 45:24-46:3).

RESPONSE:      Delta admits the Lemley Defendants sold travel club memberships at the presentations.   Delta denies that the record evidence cited supports the remainder of the alleged factual statements.

19.   Instead, the presenters were identified as representatives of the separate vacation fulfillment company. (Pl.'s Resp. to Def.'s Interrog. No. 19; Huhn Dep. 43:13-16). Moreover, on the form used to consummate a sale, there was no reference to Delta. (Huhn Dep. 45:21-23).

RESPONSE:      Admitted.

20.   In June of 2013, the Lemley Defendants received a letter from Delta's outside counsel, inquiring as to the origins of an allegedly infringing postcard bearing Delta trademarks. (Ex. 23 to Lemley Dep.).

RESPONSE:      Admitted.

21.   Upon receiving this letter, the Lemley Defendants called SB Global to inquire as to the legality of SB Global's use of Delta trademarks on their postcards. (Lemley Dep. 159:7-11).

RESPONSE:      Admitted.

22.   SB Global assured the Lemley Defendants that its use of Delta trademarks was not illegal, given the use of a disclaimer. (Lemley Dep. 159:12-15; Deposition of Christi Wigle 169:14-21, April 29, 2015, excerpts attached hereto as Exhibit E).

RESPONSE:      Delta admits that SB Global gave assurances to the Lemley Defendants, but denies that the Lemley Defendants' reliance on those assurances was reasonable.  Lemley conducted no investigation of SB Global or its principal, Laurent Hazout, at any point during their relationship – no research, no background check, and not so much as a Google-style Internet search.  *(Lemley Depo at 210:1-18)*. Lemley never requested any mark-related representations in writing from Global and never bothered to execute a written contract.  *(Id. at 101:19-102:11; 107:7-18; 136:22-137:2)*.  Other than his fraudulent June 14, 2013 response letter, Lemley never contacted Delta and never sought additional information or explanation from Delta.  Lemley claims that he blindly relied on Hazout's explanation because he assumed that Hazout "knew what he was doing." *(Id. at 158:11-160:19)*.  After the June 2013 conversation with Hazout, Lemley blindly "moved forward with the understanding that [Hazout] would continue to use third-party airline marks [including Delta's] in the postcards." *(Id.)*.  For at least the next four months, the Lemley Defendants ignored Delta's June 2013 demand letter and continued to use postcards bearing counterfeit Delta Marks. *(Id.)*.

23.    The Lemley Defendants relied on SB Global's assurances and its thirteen years of experience in the industry. (Lemley Dep. 139:2-4).

RESPONSE:        See response to paragraph 22 above.

11

24.    After relying on SB Global's representations, the Lemley Defendants later learned from a business partner that SB Global's use of Delta trademarks could be problematic. (Lemley Dep. 140:2-18; Wigle Dep. 159:5-160:19).

RESPONSE:        Denied.   The Lemley Defendants already were or should have been aware that SB Global's use of counterfeit Delta Marks was infringing and illegal because on June 11, 2013, Lemley received a demand letter from Delta's attorney to one of Lemley's whack-a-mole Middleman companies (Oracle).  *(Id. at 143:12-145 and Exhibit 23 thereto at 1-4 (Delta Demand Letter) (copy attached hereto at Exhibit I ))*.

25.    After learning this, the Lemley Defendants sent their own Cease and Desist Letter to SB Global on October 30, 2013. (Ex. 18, p. 3 to Lemley Dep.).

RESPONSE:        Admitted.

26.    In this letter, the Lemley Defendants demanded that SB Global cease using all third party marks, including Delta's. (Ex. 18, p. 3 to Lemley Dep.).

RESPONSE:        Admitted.

27.    Shortly after sending this letter, the Lemley Defendants exited the travel club sales business and ceased "using" any Delta trademarks. (Lemley Dep. 44:6- 10, 132:7-10).

RESPONSE:        Admitted.

28.    Delta has suffered no actual damages or financial loss from the conduct of any

Defendant in this litigation, let alone the conduct of the Lemley Defendants.

(Pl.'s Resp. to Def.'s Interrog. No. 23).

RESPONSE:      Delta denies that this fact is relevant or material to the pending

motion for summary judgment.  The Lemley Defendants' mail fraud, wire fraud, and

counterfeiting proximately caused harm, including, but not limited to, unjust

enrichment damages to Delta, as both a matter of fact and a matter of law.  *(Exhibit A,*

*Lemley Depo. at 241:14-242:5 and Exhibit 24 thereto (CPA Report))*.

29.    Delta has made no damages calculation and has not designated a damages

expert. (Deposition of Mauricio Parise 6:2-20, March 4, 2015, excerpts attached as

Exhibit F hereto).

RESPONSE:      Delta admits that it has not designated a damages expert.  Delta

denies that it has made no damages calculation.  Delta has made showings regarding

both infringer's profits or so-called unjust enrichment damages, as set forth in

response to paragraph 28 above, and Delta has made and previously submitted a

separate calculation regarding statutory damages for counterfeit.

30.    Delta has no evidence that the Lemley Defendants' use is likely to impair the

distinctiveness of Delta's trademarks or harm Delta's reputation. (Deposition of

Alan Arnold 33:5-13, March 3, 2015, excerpts attached as Exhibit G hereto; Parise

Dep. 6:13-15).

RESPONSE:    Denied.    According to Lemley, there is a public "guilt by association" for companies involved or perceived to be involved in the travel club industry. *(Id. at 77:20-25)*.    As he explained, consumers are unable to distinguish between the entities responsible for sending the subject postcards and conducting the pertinent sales presentation and the entities involved in the other aspects of the industry, including airfare incentives (travel certificates). *(Id. at 78:1-11)*.  "One bad company in the [travel club] interrelationship [therefore] drags down the other ones." *(Id.)*.  Lemley explained that this misdirected, reputational guilt by association arose in part from the fraudulent practices of certain travel club companies he represented. *(Id. at 60:8-62:14)*.   He stressed, however, that the worst "guilt by association" reputational damage occurred in the specific aspect of the travel club industry with which Delta was involuntarily associated:  the "travel certificate" niche. *(Id. at 70:11-72:7; 163:24-166:10;*  Lemley says he found it difficult to find <u>anyone</u> in the travel certificate business who was ethical. *(Id. at 89:12-20)*.  **<u>By Lemley's own admission, many of these "bad companies" were directly involved with Delta Postcard recipients, tainting the reputations of all companies with a real or perceived role in the bogus airfare promotions touted therein.</u>** *(Id. at 70:11-72:7; 77:25; 163:24-166:10)*.  Lemley testified that the worst of these "bad companies"

was the Lemley Defendants' primary travel certificate provider – Defendant Grand Incentives – whom Lemley referred to as "sleazebags." *(Id. at 68:5-10; 89:12-20)*. According to Lemley, the resulting guilt by association so tarnished the reputations of his Middleman companies, he was required to periodically change the company name or corporate vehicle to escape the notoriously bad publicity that attached to everyone believed by the public to be involved. *(Id. at 70:11-72:7; 163:24-165:15)*.

31.   Delta has no evidence that any individual failed to buy a Delta airline ticket because of the Lemley Defendants. (Arnold Dep. 51:7-11).

RESPONSE:      Admitted.

32.   The products and the sales methods of Delta and the Lemley Defendants greatly differ, as do their advertising methods. For example, Delta does not offer travel club memberships or services, (Arnold Dep. 81:11-13), and the Lemley Defendants do not sell airline tickets. (Lemley Dep. 33:15-25).

RESPONSE:      Denied.   Delta's primary business activity involves the sale of Delta passenger airfares.   *(TRO Motion [DE 10] at Ex. A, Arnold Dec. ¶ 4)*.   The infringement in the Delta Postcards involves the Lemley Defendants' literal impersonation of Delta in relation to a supposed Delta promotion of discounted passenger airfares.   *(Exhibit C, Lemley Postcards)*.   The Delta Postcards direct each recipient to claim his or her supposed Delta airfares by calling a specified toll-free

number.   Delta offers the same sales medium – toll-free phone numbers – for its customers.  *(TRO Motion [DE 10] at Ex. A, Arnold Dec. ¶ 10)*.   The Delta Postcards were sent to consumers via the U.S. Postal Service.   Delta also uses the U.S. Postal Service to advertise its airfare promotions.  *(TRO Motion [DE 10] at Ex. A, Arnold Dec. ¶ 10)*.   The pertinent advertising channels are identical.

33.    Delta has produced no evidence of actual confusion between it and any Lemley Defendant. (Arnold Dep. 80:4-10).

RESPONSE:        Denied.  Defendant Lemley's brother Colvin Lemley, who handled all complaints received by Lemley's Certificate Middleman companies, acknowledged that those companies received complaints[1] from Delta Postcard recipients who believed on the basis of the postcard that there existed some Delta-related affiliation, relationship, or representation sufficient to entitle them to insist upon receiving airfares on Delta, rather than any other carrier.  *(Exhibit K, Colvin Lemley Depo at 23:21-24; 36:25-38:17)*.

34.    The Lemley Defendants lost money during the few months that they were engaged in travel club membership sales. (Ex. 24, p. 3 to Lemley Dep.).

---

[1] Even after learning of Delta's filing of the current lawsuit in December 2013 and receiving Expedited Discovery from Delta at that time, the Lemley Defendants have continued throughout the interim to destroy these complaints. *(Exhibit A, Lemley Depo at 76:22-77:19 and 226:20-228:24)*.  Delta intends to file a motion regarding the evidentiary presumptions to which Delta is entitled as a result of this spoliation.

RESPONSE:      Denied.  The methodology by which the Lemley Defendants

derived their supposed net loss is inherently flawed.  They have failed to account for:

(1) Lemley Distributor income generated at sales presentations publicized by Delta Postcards outside of Atlanta, Georgia and prior to September 2013; *(Exhibit A, Lemley Depo. at 241:14-242:5 (report purportedly showing lack of Delta-related distributor profits was arbitrarily limited in scope to Atlanta sales presentations during the last two months of Lemley's Distributor operations) and Exhibit 24 thereto (CPA Report));* and

(2) income received by the Lemley Travel Certificate Middleman from consumers who attended a sales presentation (whether by a Lemley Distributor or another Distributor or Marketer) publicized by Delta Postcards and subsequently paid to activate the Lemley Middleman travel vouchers they were given.  *(Id.)*.

35.     The only "consumer evidence" Delta has offered are communications from

employees and one costumer, all of whom knew that Delta was not sponsoring any

travel club presentations. (Arnold Dep. 35:1-38:4).

RESPONSE:      Denied.  See response to paragraph 33 above.

36.     The Lemley Defendants never used "letters" or "tickets" such as those shown

in Paragraph 81 of Delta's Second Amended Complaint. (Pl.'s Resp. to Def.'s

Interrog. No. 1, 13).

RESPONSE:      Admitted.

## STATEMENT OF ADDITIONAL FACTS

1.         Defendant Dynamic Premium Incentives, LLC ("DPI") dba American

Travel Suppliers ("ATS") and dba Nationwide Travel Promotions ("NTP") and

Defendant KTP, LLC dba King Travel Promotions ("KTP") (collectively the "Lemley Distributors") served as "distributors" for several travel club companies (aka "travel fulfillment companies"), including Defendant JD&T Enterprises. *(Exhibit A, Lemley Depo. at 30:4-35:8; 50:11-51:3)*. The Lemley Distributors planned, advertised, and conducted sales presentations for the travel club companies they represented. *(Id. at 43:8-22; 92:20-24; 242:10-17)*.

2.      The Lemley Distributors engaged in distributor-related business from February 2013 through November 2013, conducting travel club membership sales presentations across the country. *(Lemley Depo at 43:11-22; 240:10-17; see also Exhibit B, Presentation Locations)*. To attract attendees, the Lemley Distributors used direct mail campaigns in which they impersonated Delta and other famous third-party airlines via postcards bearing counterfeit marks of the victimized airlines. *(Id. at 92:20-24; 115:15-23; 135:23-140:1; 160:11-19; 205:22-25; 256:10-14)*. Each postcard notified the recipient that he would receive two complimentary airfares pursuant to a supposed sales promotion by the airline. *(Id. at 98:18-99:16)*. The Lemley Distributors' Delta-related postcards (the "Delta Postcards") each bore the "DELTA" Mark and Delta's "WIDGET LOGO" on the front and back of the postcard. *(Exhibit C, Sample Lemley Postcards (authenticated in TRO Motion [DE 10] at Ex. D.1 and D.2 to Huhn Dec.))*.

3.     The Lemley Distributors used two marketing companies to print and mail the Delta Postcards: "Global" (former Defendant Laurent Hazout and his companies Global Travel Consultants, LLC and SB Global Marketing, LLC); *(Exhibit A, Lemley Depo. at 96:7-15; 97:19-22; 100:16-102; and 206:1-4);* and "CRW" (Defendants CRW Marketing and the late Rory Whiteman); *(Id. at 96:7-15; 97:19-22; 101:3-6; 205:22-25; 96:16-97:16).* CRW also provided call center services (aka "scheduling" services) for the Lemley Defendants, as did Defendants Aerie Davis and Allstar Marketing Direct. *(Id. at 98:6-13; 206:1-4; 211:9-19).*

4.     Other Lemley-related companies operated as travel certificate middlemen ("Certificate Middlemen" or "Middlemen"), buying and reselling third-party vouchers for air travel (aka "travel certificates"). *(Exhibit A, Lemley Depo at 11:6-23; 33:10-14; 81:1-14; and 163:10-23).* The Certificate Middlemen included: Celebrity Productions, LLC; *(Id. at 10:4-11:5)*; Eagles Choice, LLC; *(Id. at 18:23-20:11)*; DPI (who also performed distributor activities); *(Id. at 26:25-27:29);* Wonderland Incentives, LLC; *(Id. at 24:18-25:8)*; Orbital Promotions ("Orbital"), a registered dba of DPI; *(Id. at 31:3-21);* Oracle Travel Promotions ("Oracle"), an unregistered dba of Lemley; *(Id. at 163:10-23)*; and Eagles Fly Away, another unregistered dba of Lemley. *(Id. at 223:12-224:10).* Whenever public knowledge of one Middleman company's reputation for fraud would become sufficiently notorious,

Lemley would simply commence/continue business under a new name (hence the great number of Lemley Middleman companies). *(Id. at 70:11-72:7; 163:24-165:15)*. The Middlemen provided airfare vouchers to the Lemley Distributors and also sold to other distributors and marketers, including numerous pre-lawsuit and post-lawsuit sales to CRW. *(Id. at 94:19-23; 106:5-109:10; 110:6-19)*.

In supposed satisfaction of the airfares promised in the Lemley Distributors' postcards, presentation attendees were given a Middleman "Airfare Activation Form," that required payment of $70.00 to the pertinent Middleman. *(Id. at 70:11-72:9; 90:16-91:12; 178:6-17; and Exhibit 22 thereto at 29 (copy attached hereto at Exhibit F))*. The Airfare Activation Form promised that the attendee would receive an Airfare Reservation Form, through which he could ostensibly use the promised airfares. *(Id.)*. Instead, the attendee would next receive an "Airfare Option Form" that detailed the supposed terms of two different airfare packages (e.g., "Airfare for Two Platinum Edition" and "Take Off for Two"). *(Id. at 178:25-179:12; and Exhibit 22 thereto at 31 (copy attached hereto at Exhibit G))*. The attendee was instructed to indicate which airfare package he wished to receive and to return the completed Airfare Option Form. *(Id.)*. Supposedly, the attendee would then finally receive the promised airfares in the form of a third-party travel certificate. *(Id.)*.

5.     The travel certificates ultimately provided by the Lemley Middlemen were

purchased from a number of third-party travel certificate companies, including

Defendant Grand Incentives, Executive Tour and Travel Services ("ETTSI"), and

several others.  *(Id. at 11:6-23; 60:19-61:8; 78:17-79:16; 81:15-82:10; 249:4-250:2;*

*and 267:12-268:1)*.  The governing terms and conditions – including draconian

limitations on the airfares actually available – varied from one travel certificate

company to the next and, within a given company, from one certificate type to the

next.  *(Id. at 70:11-72:7; 180:20-181:4; 186:12-16; 190:21-193:2)*.  If the redeemer

of a Middleman Airfare Option Form actually received one of these companies'

travel certificates, he would recommence the paperwork process with the travel

certificate company, to whom he was often required to pay additional fees.  *(Id.)*.

6.     On or shortly after June 11, 2013, Lemley received a letter from Delta's

attorney to one of Lemley's whack-a-mole Middleman companies (Oracle).  *(Id. at*

*143:12-145 and Exhibit 23 thereto at 1-4 (Delta Demand Letter) (copy attached*

*hereto at Exhibit I ))*.  In that letter, Delta complained of the illegal use of the Delta

Marks in postcards sent pursuant to the same travel club scheme that would later give

rise to the present lawsuit:

> We have learned from reliable sources that your company is involved in a
> travel club scheme relating to the use of postcards that infringe the
> valuable trademark rights of our client in the trademark DELTA and which
> further constitute other acts in violation of our client's rights. . . .  We seek
> your voluntary cooperation in identifying the parties or entities that created
> and that were involved in producing the attached postcard, as well as that

were involved in its dissemination. Also, please fully advise us of your
involvement in the travel scheme associated with these postcards.

*(Id.)*.  Attached to Delta's letter was a copy of the postcard, which bore Delta Marks

(name and logo) on the front and back.  *(Id.)*.  The postcard described a supposed

Delta airfare promotion in relation to which the recipient would receive two round

trip airfares.  *(Id.)*.  The postcard was addressed to a resident of Fort Worth, Texas.

*(Id.)*.  The postcard also included the location (Las Vegas) and unique U.S. Postal

Service bulk permit number (2736) of the company that mailed the postcard.  *(Id.)*.

7.     Lemley reviewed Delta's demand and directed the June 14, 2013 response:

> Company is not now and has not in the past been, involved in any way with
> the creation of, production of, distribution of, or use of, the "postcard"
> attached to your letter.  **Company has no knowledge of the parties involved**.
> . . . Company does not now possess and has never in the past possessed, any
> such "postcard." Company is not now and has not in the past been, involved in
> any way with any "travel scheme" associated with the postcard.

*(Id. at 144:18-145:10 and Exhibit 23 thereto at 5, Lemley Response Letter (copy*

*attached hereto at Exhibit J) (emphasis added))*.  By Lemley's later sworn admission,

this response was materially false.  *(See discussion below.)*

8.     As Lemley knew at the time of his false response, his company (Oracle) was

the Certificate Middleman for the sales presentations promoted by the postcard

attached to Delta's letter (i.e., each Fort Worth attendee would receive an Oracle

Airfare Activation Form). *(Id. at 151:4-158:19)*.  Moreover, Lemley's business

records included: (1) which Airfare Activation Forms (logged by unique certificate numbers) had been sold to which of his marketer/distributor customers; and (2) personally-identifying information for all Fort Worth presentation attendees who submitted a completed Airfare Activation Form.  *(Id.).*  By his own admission, Lemley could have identified the involved distributor or marketer simply by referencing the certificate numbers of Airfare Activation Forms redeemed by Fort Worth-area holders.  *(Id.).*

9.     Notwithstanding his denial of having any pertinent information whatsoever, Lemley also necessarily knew from the face of the postcard (i.e., from the permit number and bulk mail company location) the identity of the marketing/bulk mail company that sent the postcard – Lemley's own marketer (Global), who, under that same permit number (2736) and from that same location (Las Vegas), had been providing bulk mail services for the Lemley Distributors since at least April 2013. *(Id. at 96:7-15; Exhibit C.2 hereto (Lemley Delta Postcard sent by Global with same bulk permit number and stamp; TRO Motion [DE 10] at Exhibit C.N.6 (Postal Service FOIA response showing permit holder to be Global)).*

10.     After denying any knowledge of the subject Delta Postcard, Lemley immediately contacted the very marketer who sent that postcard – Global – to discuss the legality of the Delta Postcards.  *(Exhibit A, Lemley Depo at 158:11-19).*  By

Lemley's own admission, he was told that Global did **not** have any mark-related license or permission from Delta.  Lemley claims that he was instead told that, despite the lack of any license or permission, the supposed disclaimers contained in the Delta Postcards made the use of the Delta Marks "okay."  *(Id. at 135:23-140:1)*.

11.     The "disclaimer" supposedly relied upon by Lemley does not even arguably contain effective language.  *(Exhibit C, Lemley Delta Postcards)*.  The only mark-related provision states, "All trademarks and service marks are the property of their respective owners."  *(Id.)*.  This meaningless sentence literally says nothing more than "whoever owns the mark owns the mark."  This language does not purport to disclaim Delta's involvement and provides no notice whatsoever that the advertised airfare promotion is not an authentic Delta airfare promotion.

12.     Lemley conducted no investigation of Global or Hazout at any point during their relationship – no research, no background check, and not so much as a Google-style Internet search.  *(Id. at 210:1-18)*.  Lemley never requested any mark-related representations in writing from Global and never bothered to execute a written contract.  *(Id. at 101:19-102:11; 107:7-18; 136:22-137:2)*.  Other than his fraudulent June 14, 2013 response letter, Lemley never contacted Delta and never sought additional information or explanation from Delta.  Lemley claims that he blindly relied on Hazout's explanation because he assumed that Hazout "knew what he was

doing." *(Id. at 158:11-160:19).*  After the June 2013 conversation with Hazout,

Lemley blindly "moved forward with the understanding that [Hazout] would continue

to use third-party airline marks [including Delta's] in the postcards." *(Id.).*  For at

least the next four months, the Lemley Defendants ignored Delta's June 2013 demand

letter and continued to use postcards bearing counterfeit Delta Marks.  *(Id.).*

13.    By Lemley's own admission, the Delta Postcards sent at his and Defendant

Wigle's direction were facially fraudulent.  The Delta Postcards represented that

every recipient would receive the referenced airfares.  *(Id. at 104:12-105:5).*  In fact,

however, numerous postcard recipients called the designated toll-free number only to

be told that they would <u>not</u> receive the promised airfares.  *(Id.).*  The Delta Postcards

failed to disclose that a recipient would <u>not</u> receive the promised airfare package if he

were 30 years old or younger; if his annual income were less than $50,000; if he had

no "significant other;" if he had no driver's license; if he had no major credit card; if

he did not speak English; or if he were not a U.S. citizen or permanent resident.  *(Id.*

*at 256:15-259:17).*  The Delta Postcards were also silent as to their true source – the

Lemley Distributors – and instead purported, by use of counterfeit Delta Marks, to be

part of an authentic Delta airfare promotion.  *(Id. at 233:15-19).*  Perhaps most

fundamentally, Lemley admitted that the airfare packages ultimately offered to a

Delta Postcard recipient differed materially from the postcard's promise that Delta

had "selected [the recipient] to receive two roundtrip airfares." *(Id. at 188:11-22)*.

14.    The Lemley Distributors' call centers sometimes falsely told responding postcard recipients that no payment was necessary to obtain the promised airfares. *(Id. at 99:20-100:4)*.  These statements generated consumer confusion regarding whom to blame when the recipient later learned that there was indeed a charge. *(Id.)*.

15.    Lemley acknowledges that his Airfare Option Form materially misrepresented the actual terms of the Grand Incentives "Take Off for Two" ("TOFT") airfare package. *(Id. at 198-14-25)*.  The Airfare Option Form described the TOFT package as "Buy one [airfare,] get one Free." *(Id. at 84:19-87:5; 183:4-11; 184:17-185:8)*. TOFT was, however, by its express terms and subject to a plethora of other limitations, <u>at best</u> a "Buy one, get $350 off the second airfare" deal. *(Id.)*.  Lemley's Airfare Option Form also stated that a TOFT traveler could return any day of the week, which was not true. *(Id. at 197:21-198:25)*.  <u>Lemley's primary excuse for these material misrepresentations was that he had never actually read the terms (which were clearly printed on the TOFT certificates in his possession), because the print was too small.</u> *(Id. at 181:11-182:23)*.  Lemley now acknowledges that the TOFT packages he promised and the actual TOFT packages he delivered were "two entirely different things" and that the actual terms are "absolutely" not "nearly as good a deal" as the promised terms. *(Id. at 183:19-22 and 184:17-185:5)*.

16.    By Lemley's admission, his Airfare Option Form materially misrepresented the actual terms of the ETTSI "Airfare for Two Platinum Edition" airfare package.  The Airfare Option Form failed to disclose that ETTSI would void the entire offer: if payment were tendered by any means other than money order or cashier's check; if the holder did not have a valid e-mail address; if certain forms completed by the customer were not returned within seven days; and/or if the holder did not have a major credit card.  *(Id. at 190:21-193:2; 196:20-197:8).*  Lemley was also aware that the Airfare for Two Platinum Edition certificate falsely claimed that ETTSI's ability to provide requested airfares was subject to its supposed "allotment" of cut-rate tickets from each participating airline.  *(Id. at 193:25-196:19).*  At least between Delta and ETTSI, there was no such allotment or deal.  The "allotment" was a material fabrication – "unethical" in Lemley's judgment – designed to serve as yet another excuse to refuse to honor a certificate holder's compliant ticket request.  *(Id.).*

17.    There was additional fraud in the Middleman Certificate redemption process. Delta investigator Tim Huhn attended a Lemley Distributor sales presentation and then tried to redeem the Middleman airfare voucher he received at the presentation. *(Id. at 176:11-186:23).*  Huhn paid in full and completed all required Middleman paperwork but, despite repeated demands, never received the certificate that he selected.  *(Id.; see also Exhibit K, Colvin Lemley Depo at 33:19-36:2 (acknowledging*

27

*that, despite his demands, Huhn never received the certificate for which he paid)).*

Respectfully submitted this 28th day of August, 2015.

WELLBORN, WALLACE & WOODARD, LLC

1175 Peachtree St., NE
100 Colony Square, Suite 300
Atlanta, Georgia 30361
Phone:  (404) 815-9595
Fax:      (404) 815-9957
E-mail:  pete@wellbornlaw.com
             kelly@wellbornlaw.com
             jamie@wellbornlaw.com

/s/ Kelly O. Wallace
Paul F. Wellborn III
Georgia Bar No. 746720
Kelly O. Wallace
Georgia Bar No. 734166
Jamie Woodard
Georgia Bar No. 775792
Attorneys for Plaintiff Delta Air Lines, Inc.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DELTA AIR LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. |
| JOHN WUNDER et al., | ) | 1:13-CV-03388-MHC |
| | ) | |
| Defendants. | ) | |

## <u>RULE 7.1 CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1</u>

This certifies that the foregoing Response to Statement of Material Facts was

prepared using 14 point Times New Roman font and accordingly complies with Local

Rule 5.1.  This certificate is given in compliance with Local Rule 7.1(D).

This 28th day of August, 2015.

WELLBORN, WALLACE & WOODARD, LLC

/s/ Paul F. Wellborn III

1175 Peachtree St., NE
100 Colony Square, Suite 300
Atlanta, Georgia 30361
Phone:  (404) 815-9595
Fax:      (404) 815-9957
E-mail:  pete@wellbornlaw.com
             kelly@wellbornlaw.com
             jamie@wellbornlaw.com

Paul F. Wellborn III
Georgia Bar No. 746720
Kelly O. Wallace
Georgia Bar No. 734166
Jamie Woodard
Georgia Bar No. 775792

*Attorneys for Plaintiff Delta Air Lines, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DELTA AIR LINES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. |
| JOHN WUNDER et al., | ) | 1:13-CV-03388-MHC |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2015, I electronically filed this Response

to Statement of Material Facts with the Clerk of Court using the CM/ECF system

which will automatically send e-mail notification or other sufficient notice of such

filing to the following attorneys of record:

| Counsel For | Attorney | E-mail Address |
|---|---|---|
| Grand Incentives, Inc. | Marvin P. Pastel II | mpastel@wczlaw.net |
| Jose Martinez | | |
| Grace Martinez | | |
| Kessler Creative, LLC | John Steven Parker | jsparker@parkmac.com |
| Keith Kessler | Daniel I. MacIntyre IV | dmac@parkmac.com |
| Dina Kessler | Bryan Gort | bgort@parkmac.com |
| | Michael Lindell | mlindell@lindellfarson.com |
| | Roger Gannam | rgannam@lindellfarson.com |
| Classic Promotions & Premiums, Inc. | Ava K. Doppelt | adoppelt@addmg.com |
| John Vanginhoven | Edward McAfee | edward.mcafee@lewisbrisbois.com |
| | Jonathan Goins | jonathan.goins@lewisbrisbois.com |
| | Stephanie Delatorre | stephanie.delatorre@lewisbrisbois.com |
| James Curtis Lemley | Stephen M. Dorvee | stephen.dorvee@agg.com |
| Nationwide Travel Promotions | Scott Taylor | scott.taylor@agg.com |
| King Travel Promotions | Lauren Gregory | lauren.gregory@agg.com |
| American Travel Suppliers | | |
| Oracle Travel Promotions | | |
| Orbital Promotions | | |

Christi Wigle

I further certify that on this date, I served the following parties by placing a copy of the referenced filing with the United States Postal Service for delivery via first-class mail in an envelope with adequate postage affixed thereto addressed as follows:

**JD& T Enterprises, Inc.**
c/o Timothy Binder
5404 Morehouse Ave., Suite 315
San Diego, CA 92121

**Chelsee Fly**
1007 Jamsie Cove Dr.
Charleston, S.C. 29412

**Bridgewater Marketing, LLC d/b/a Tier 3 Productions**
c/o SmallBiz Agents
7300 Yellowstone Rd., Suite 10
Cheyenne, WY 82009

**Rob Fly**
1007 Jamsie Cove Dr.
Charleston, S.C. 29412

**Mail to You, LLC**
c/o SmallBiz Agents
7300 Yellowstone Rd., Suite 10
Cheyenne, WY 82009

**Delta Sky Rewards, LLC**
c/o SmallBiz Agents
7300 Yellowstone Rd., Suite 10
Cheyenne, WY 82009

**Mailhouse, LLC**
c/o SmallBiz Agents
7300 Yellowstone Rd., Suite 10
Cheyenne, WY 82009

**SB Global Marketing, LLC**
The Company Corporation
2711 Centerville Rd., Suite 400
Wilmington, DE 19808

**Travel Club Marketing Brokers, LLC**
c/o SmallBiz Agents
7300 Yellowstone Rd., Suite 10
Cheyenne, WY 82009

**John Wunder (Pro se)**
John Wunder
Express Investments
2525 W. Carefree Highway, Suite 124
Phoenix, AZ 85085

**Allstar Marketing Direct, LLC**
5568 General Washington Dr.
Alexandria, VA 22312

**Aerie Davis**
c/o Daniel M. Press, Esq.
Chung & Press, P.C.
6718 Whittier Ave., Suite 200
McLean, VA 22101

**CRW & Estate of Charles R. Whiteman**
52 Helmsman Dr.
Yarmouth Port, MA 02675

WELLBORN, WALLACE & WOODARD, LLC

/s/ Paul F. Wellborn III

1175 Peachtree St., NE
100 Colony Square, Suite 300
Atlanta, Georgia 30361

Phone:  (404) 815-9595
Fax:      (404) 815-9957
E-mail:  pete@wellbornlaw.com
             kelly@wellbornlaw.com
             jamie@wellbornlaw.com

Paul F. Wellborn III
Georgia Bar No. 746720
Kelly O. Wallace
Georgia Bar No. 734166
Jamie Woodard
Georgia Bar No. 775792

*Attorneys for Plaintiff Delta Air Lines, Inc.*

4